Filed 10/27/21  In re Matthew S. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MATTHEW S. et al., Persons Coming Under the Juvenile Court Law. | B309692 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>K.P.,<br><br>　　　Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 20LJJP00137A, 20LJJP00137B 20LJJP00137C) |

　　　APPEAL from findings and orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed in part, reversed in part, and remanded with directions.

　　　Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

———————————

K.P. (mother) appeals from the juvenile court's jurisdictional findings as to her three children, four-year-old M.S., three-year-old J.M., and one-year-old K.M., and from the dispositional orders removing the children from mother's custody. Mother also challenges the juvenile court's dispositional orders regarding her visitation with the children and assessment of relatives for placement of the two younger children.

We are asked to determine whether substantial evidence supports the juvenile court's jurisdictional findings and whether clear and convincing evidence supports the court's dispositional orders. We are also asked to determine whether the Los Angeles County Department of Children and Family Services (the Department) and the juvenile court complied with the requirements of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).

We conclude that, while the evidence is sufficient to support the jurisdictional findings, the juvenile court's dispositional orders must be reversed because the juvenile court did not, as required by Welfare and Institutions Code,[1] section 361, subdivisions (c) and (e), determine whether there was clear and convincing evidence that there were no reasonable means to prevent or to eliminate the need for removal of the children from mother's home, and did not state the facts on which the decision to remove was based, and these errors were prejudicial. For

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

these reasons, and to ensure compliance with ICWA, we reverse the disposition orders and conditionally affirm the ICWA finding, and remand for a new dispositional hearing and further proceedings under ICWA.

## BACKGROUND

I.      Family history.

Mother first came to the attention of the Department in September 2017, due to a report that she was neglecting M.S. The report was closed as inconclusive because M.S. was observed to be healthy and bonded to mother, and mother agreed to a drug test, which was positive only for marijuana.

The Department received another report in November 2017, due to a domestic violence incident in which D.M., the father of the two younger children, hit mother while she was holding M.S. in her arms and while she was pregnant with J.M. D.M. was arrested and convicted of a misdemeanor, placed on probation, and ordered to complete a 52-week domestic violence program. A criminal protective order was issued, prohibiting D.M. from having contact with mother.

This incident led the Department to offer voluntary services to mother and D.M., including family preservation services, parenting classes, and counseling. Mother and D.M. did not participate in these services, mother moved to San Bernardino County, and so the Department closed the voluntary services case in February 2018 due to loss of contact with the family.

Mother and D.M. remained in a relationship "on and off" after this incident and had another child together, K.M., who was born in late 2019. In June 2019, maternal aunt V. called the police two times because D.M. was outside refusing to leave or

banging on the door. In October 2019, maternal aunt V. called the police a third time because D.M. knocked on a window and broke it. D.M. left before the police came; the police issued a warrant for violation of the criminal protective order.

In early February 2020, mother became upset because someone informed her that D.M. was "cheating on her," so she called the police and informed them of D.M.'s whereabouts, at his parents' home. The police arrested D.M. on the outstanding warrant for the window-breaking incident.

When D.M. was released from jail, he and mother went to the criminal court together and obtained a modification of the criminal protective order to allow for peaceful contact for purposes of visitation exchanges. After leaving the criminal court, mother and D.M. got into an argument in mother's car. Mother became despondent and threatened to commit suicide by taking pills. According to mother, D.M. said he did not care and encouraged her to take the pills. He then left mother's car without making any attempt to get help, and stole money and other items from the car. Mother was later found unresponsive in her car, having taken an overdose of prescription medications and methamphetamine. Mother was in a coma for two days, and then was transferred to a psychiatric hospital. She was released on February 19. In the hospital, mother refused to attend therapy or a drug program, said she did not have any mental health or substance abuse problems, and said she did not remember what happened on February 13.

During the days preceding and following February 13, 2020, the children J.M. and K.M. were cared for by various relatives. M.S. stayed with his father, pursuant to a family law order giving mother and M.S.'s father joint custody. A few days

4

before February 13, D.M. had taken J.M. and K.M. from mother's home to his parents' home. There were indications that this was not a safe situation for the children; mother and maternal aunt V., when later interviewed by the Department, said paternal grandmother and her boyfriend drank heavily; paternal grandmother previously had her children removed; and the boyfriend was on parole.

After D.M. was arrested, paternal grandmother called maternal aunt R. and asked her to pick up the children. Maternal aunt R. kept the children until February 15, but was unable to continue caring for them. She was also living with maternal grandfather, who has a criminal record for sex offenses. Maternal aunt R. brought the children to maternal aunt V. Maternal aunt V., although willing to care for J.M. and K.M., had three small children and was pregnant with a fourth. She told a Department social worker she could not afford to take in mother's children as well. Also, maternal aunt V. told the social worker that K.M. had been sick but she was unable to take her to the doctor due to lack of authorization by mother. When the social worker asked mother to make a "safety plan" of allowing the children to stay with maternal aunt V., and signing an affidavit authorizing maternal aunt V. to obtain medical care for the children, mother refused, saying she would be released the next day and the children would be fine with her.

The Department obtained a removal warrant and detained the children in a foster home.

II.     Dependency proceedings

The Department filed a dependency petition. The petition alleged four counts concerning mother under section 300, subdivisions (a) and (b). Counts a-1 and b-4 alleged that the

children were at risk of harm due to domestic violence between mother and D.M., violations of the criminal protective order, and mother's failure to protect the children; count b-1 alleged that the children were at risk of harm due to mother's mental and emotional problems and suicide attempt; and count b-2 alleged that the children were at risk of harm due to mother's abuse of methamphetamines, prescription medications and marijuana.[2] The petition was later amended to add a b-5 count regarding M.S.'s father's use of alcohol and marijuana.[3]

When interviewed by social workers on February 27 and March 12, 2020, mother denied any incidents of physical violence with D.M. since November 2017, but stated that she had been in a "mentally and emotionally abusive" relationship with him for many years and that he had driven away her friends and family members, so she was "left with nothing and nobody but him."

Mother admitted a history of drug use years ago, but denied any current drug use. Mother had no explanation as to why she tested positive for methamphetamine after the February

---

[2] The petition also included a b-3 count regarding D.M.'s drug use. The juvenile court found the evidence insufficient to sustain this count and dismissed it, but it was mistakenly included in the sustained petition. The Department's July 19, 2021 request for judicial notice as to the juvenile court's June 25, 2021 minute order correcting the October 16, 2020 minute order, *nunc pro tunc*, is granted. The Department's July 19, 2021 motion to dismiss is granted in part, as to mother's challenge to the b-3 count, since this claim is moot.

[3] Mother also challenges the sufficiency of the evidence as to the b-5 count. Mother is not named in that count, and her counsel made no objection to the juvenile court sustaining it at trial, so we decline to consider this claim.

2020 overdose incident, or why methamphetamine was found in her possession.  When asked about prescription medications, mother said she was employed by an elderly man, Mr. D., who allowed her to live in his home rent-free in exchange for providing care to him, and to keep his medications safe, she stored them in her purse.  Mother also said this man would "try to buy Norco" from mother and her friends, and they all shared prescription medications.  When interviewed by a social worker, Mr. D. said he was trying to get mother out of his home because she was stealing his medications, and had also stolen money from him and taken his car without permission.

When interviewed by a social worker, maternal aunt V. said mother was using drugs during her pregnancy with K.M., and that she had received text messages from mother admitting drug use.  Maternal aunt V. gave copies of these text messages to the social worker, and they were included as attachments to the detention report.  D.M. also said he suspected mother was using drugs because she told him she had used methamphetamines with M.S.'s father in the past, and she had recently lost weight.

Mother denied having any mental health issues.  She said she had been hospitalized once before at age 13, and had been forced to participate in therapy as a teenager, but did not think she currently needed therapy or medication.  Nonetheless, mother contacted a provider of mental health services in February 2020, was diagnosed with anxiety and depression, and got a prescription for an antidepressant medication and a referral for therapy.

At the detention hearing, mother did not appear.  The juvenile court ordered all three children detained from mother and D.M., released M.S. to his father, and ordered that mother

was not to have visits until she made herself available to the Department.

Between the detention hearing and her arraignment in July 2020, mother was not in consistent contact with the Department. Mother had one in-person visit with the children on March 4, 2020. In mid-March 2020 the Department suspended in-person visitation in response to the COVID-19 pandemic. Mother was offered video visits, but was only present for two such visits, one in May and one in June. On May 5, 2020, mother responded to an email from the social worker and provided a new telephone number and address. On June 29, 2020 mother told the social worker she was speaking with attorneys and planned to appear for arraignment. Mother was referred for drug testing, but did not submit to any tests.

Mother made her first appearance in the juvenile court on July 8, 2020 and counsel was appointed for her. Mother's counsel stated that mother was attending Alcoholics Anonymous and Narcotics Anonymous meetings, parenting classes, and was "getting into counseling."

The Department submitted a supplemental report to the court in September 2020, stating that mother had missed "more than 75%" of her scheduled video chat visits, had not provided any documentation showing she was enrolled in any classes or programs, and had not submitted to any drug tests.

At the jurisdictional hearing in October 2020, the juvenile court admitted the Department's evidence and heard argument. The court sustained counts a-1,[4] b-1, and b-2, stating,

"Although the domestic violence occurred in 2017, the court, after reviewing all of the reports and hearing counsel, does

---

[4] The juvenile court dismissed count b-4 as redundant.

8

feel that the children still are at risk with regard to this allegation because I don't see that the parents have really addressed this issue in a way that wouldn't pose the children to be at risk in the future.

"With regard to (b)(1), mother's mental health issue, I also agree with [minors' counsel and county counsel] that the mother's mental health issues are so significant.  She overdosed in February of this year.  She was involuntarily hospitalized; that she needs to demonstrate to court that she is—her mental health is stabilized.  And certainly that would impact the child's well-being if untreated.  [¶] . . . [¶]

"With regard to the (b)(2) count, the court is going to sustain it.  I think that mother's drug use—as we know that she had a recent test in February for methamphetamine, I do think she is in denial about that drug use and she needs to properly address it through services so that the child can be safely returned home to her.  And that is a particularly dangerous drug if it goes untreated."

Prior to the disposition hearing, the Department submitted a last minute information for the court, stating that the Department had, after over 6 months of restricting mother to virtual visits, set up in-person visits for mother once a week, but mother had failed to show up for one visit in October, had confirmed too late and therefore missed another visit in November, and two other visits had been cancelled by the Department, one due to political unrest and another due to K.M. being ill.  The Department noted, however, that mother was now attending approximately 85 percent of her thrice-weekly video visits; she was scheduled to have a mental health assessment;

and she had submitted to one drug test in October 2020, which was negative for all substances.

At the dispositional hearing on December 3, 2020, the court admitted the Department's reports into evidence, and county counsel rested. Mother's counsel argued that the children should be released to mother under court supervision, because the Department had not shown by clear and convincing evidence that removal was necessary. Mother's counsel pointed out that mother's overdose/suicide attempt was an isolated incident almost a year ago; since then mother had received a prescription for antidepressant medication and was engaged in counseling, referring to an exhibit showing that mother had a therapy session in October 2020; mother had a recent negative drug test; and the Department had visited mother's new residence and not found any safety hazards other than cigarette smoke odor. The minors' counsel joined with the Department in requesting removal from mother, stating that "[w]hat's disturbing is . . . mother not consistently testing and really no evidence of any ongoing mental health services." The court then made dispositional findings and orders as follows:

" . . . I'm inclined to follow the Department's recommendation in this case.

"These children are extremely young: three, two and one. They need their parents to be sober. [¶] . . . [¶]

"With regard to . . . mother for all three children . . . pursuant to dependency court order 415, the court is removing the children from the mother . . . pursuant to dependency court disposition findings and orders, the terms of which are contained in this minute order."

10

III.   ICWA

When interviewed by social workers in February and March 2020, mother stated she did not have any Native American heritage.  However, at her first appearance in juvenile court in July 2020, mother filled out a form indicating that maternal grandfather may have Indian ancestry.  In response to questions from the court, mother said she did not have a telephone number for maternal grandfather, but he lived in the area and she could probably reach him through Facebook.  Mother said she was "not 100 percent sure," but thought he had told her "we're some type of something like Indian" when she was a teenager.  Mother said maternal grandfather was the most knowledgeable family member about Indian ancestry.

The court ordered the Department to investigate this claim, "including but not limited to speaking further with mother and any relatives that she can identify who may have knowledge regarding potential Indian ancestry" and "to provide . . . notice to any Indian Tribes or government agencies that are revealed through the Department's investigation as requiring notice."

In August 2020, the Department contacted mother, who did not provide any additional information, and tried to call maternal grandfather, but did not have a working telephone number for him.  The Department then sent notices to the Bureau of Indian Affairs listing mother's name; maternal grandfather's name and date of birth; and some maternal great-grandparents' names, but no information about possible tribal affiliation.  The Bureau of Indian Affairs responded in September 2020 that the notices contained insufficient information to determine tribal affiliation.

At the jurisdictional hearing on October 16, 2020, the court again asked mother about Indian ancestry.  She did not provide

any additional information. The court concluded "[t]hat's kind of a dead end. There's just some rumor that her father may have had Indian ancestry, but that's not enough for the Department to go on." At the dispositional hearing on December 3, 2020, county counsel requested a finding that there is no reason to know that ICWA applies, and the court made this finding.

During the pendency of this appeal, the Department interviewed maternal aunts R. and V. about possible Indian heritage, and obtained contact information from them for maternal grandfather.[5] Maternal aunts did not have any additional information. Maternal grandfather stated that his mother "said something like there is a portion, but I don't know if that passes down to my children." When asked what tribe, maternal grandfather replied, "I don't know it might have had a foot at the end of it."

## DISCUSSION

I.     The jurisdictional findings are supported by substantial evidence.

In reviewing the sufficiency of the evidence to support the juvenile court's jurisdictional findings, we determine whether the record as a whole contains substantial evidence supporting these findings, and draw all reasonable inferences in support of the court's findings. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394; *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

---

[5] The Department's July 19, 2021 request for judicial notice, as to the Department's post-appeal ICWA inquiries, is granted. The Department's July 19, 2021 motion to dismiss is denied in part, as to mother's challenge to the juvenile court's ICWA findings.

We conclude that substantial evidence supports the counts regarding domestic violence (a-1) and mother's substance abuse (b-2), so we need not consider whether the count regarding mother's mental health issues (b-1), by itself, would support jurisdiction.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Mother points out that the most recent incident of physical violence between mother and D.M. occurred almost four years before the jurisdictional hearing in this case.  She relies on *In re Ma.V. (*2021) 64 Cal.App.5th 11, *In re Jesus M.* (2015) 235 Cal.App.4th 104, and *In re Daisy H.* (2011) 192 Cal.App.4th 713, in which the appellate courts concluded that incidents of domestic violence occurring many months or years prior to the filing of a dependency petition were insufficient to support dependency jurisdiction.

These cases are distinguishable.  Unlike the parents in *In re Ma.V.*, *In re Jesus M.*, and *In re Daisy H.*, who had all separated prior to the filing of the dependency case, mother and D.M. did not either separate permanently after the 2017 incident, or take any steps to address the issue of domestic violence, but remained in a volatile "on and off" relationship at least until February 2020.  Also, two of the children were directly 'in the crossfire' and at risk of serious physical harm during the November 2017 incident—mother was holding M.S. and was pregnant with J.M.—and there was a more recent incident in October 2019 that placed the children at risk of physical harm when D.M. broke a window in the home.

In *In re John M.* (2013) 217 Cal.App.4th 410, this court concluded that a single incident of domestic violence almost a year prior to the jurisdictional hearing, during which the child was not present, was a sufficient basis for jurisdiction.  The court

13

stated that, " '[i]n evaluating risk based on a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances.  It should also consider the present circumstances, which might include . . . evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken[ ] by the parent to address the problematic conduct in the interim . . . .  The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk.' " (*Id*. at pp. 418–419, disapproved on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 628.)

Domestic violence is a pattern of conduct that includes, but is not limited to, physical assault.  (See *In re John M.*, *supra*, 217 Cal.App.4th at p. 419 [finding "parents' history of domestic violence evidences an ongoing pattern," including not only the parents hitting each other, but also frequent verbal altercations, and father engaging in reckless driving with mother in the car, so there was a risk that father would in the future "engage in angry and violent behavior toward" the child].)

Although the jurisdictional finding at issue in *In re John M.*, *supra*, 217 Cal.App.4th 410 was pled as a section 300, subdivision (b) count, the court's reasoning applies equally to the subdivision (a) count at issue in this case.  (See *In re Nathan E.* (2021) 61 Cal.App.5th 114, 119 [many cases based on exposure to domestic violence are filed under subdivision (b), but subdivision (a) may also apply where a child is at risk of suffering serious physical harm due to a parent's "nonaccidental conduct" of engaging in domestic violence].)

14

In this case, at least once in the past D.M. had physically assaulted mother without regard to the fact that she was holding a baby in her arms and was pregnant. Mother admitted that her ongoing relationship with D.M. was "mentally and emotionally abusive," and that he had isolated her from friends and family so that she had "nothing and nobody but him" to rely on, rendering her less able to protect herself and her children from future physical harm. Moreover, the juvenile court could reasonably infer from the evidence that D.M. had either encouraged mother to commit suicide in February 2020, or at least took no action in the face of a life-threatening drug overdose, and that mother's vulnerability and D.M.'s callous disregard for her life and safety increased the likelihood that the children would be harmed in the future by D.M.'s violent conduct.

Since we conclude the evidence was sufficient to support the a-1 count regarding domestic violence between mother and D.M., it is not necessary to consider the sufficiency of the evidence as to the b-1 count regarding mother's mental health problems.

We will, however, briefly discuss the evidence supporting the b-2 count concerning drug abuse, as it is also pertinent to the juvenile court's dispositional orders. Mother's counsel characterizes mother's February 2020 overdose as an "isolated incident," but there was substantial evidence that she had an ongoing drug problem. Mother did not have any plausible explanation for having methamphetamine in her possession, and testing positive for methamphetamine, in February 2020. Mother had also taken prescription drugs that did not belong to her, and admitted that she and "her friends" would share prescription drugs including Norco, an opioid medication. Two

close family members who had ongoing contact with mother, maternal aunt V. and D.M., gave specific, concrete reasons for their belief that mother was using drugs. Mother was responsible for the care of an elderly man, who stated that she had stolen prescription medications and money from him, a clear indication of " 'failure to fulfill major role obligations at work' " which may support an inference of substance abuse. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219.)[6]

There is a clear nexus between mother's substance abuse and risk of harm to her children, in light of their young age and mother's failure to make safe and stable childcare arrangements for them either before or after the February 13, 2020 incident.

---

[6] The Department relies on *In re Christopher R., supra*, 225 Cal.App.4th at p. 1217, to argue that mother's failure to submit to drug testing between detention and the jurisdictional hearing is evidence of her ongoing drug use. A parent's failure to comply with a court-ordered drug test " 'is rightfully looked upon as a positive test.' " (*In re Lana S.* (2012) 207 Cal.App.4th 94, 104, fn. 5; *In re N.M.* (2003) 108 Cal.App.4th 845, 857 [if a parent fails to test as required by a court-ordered case plan, " 'the test will be considered positive for controlled substances' "].) But we do not believe this inference is appropriate when a parent has not been court-ordered to test, and merely declines to submit to voluntary drug testing. The Department cannot rely solely on a parent's failure to submit to voluntary testing, to prove a drug abuse allegation. The trial court may, however, take the fact that a parent denies drug use but avoids testing into account, along with all the other evidence, in determining whether the Department has met its burden of proof. In this case, even without drawing any inferences from mother's missed tests, the b-2 count concerning mother's drug abuse is supported by substantial evidence.

16

(See *In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1217, 1219 [parent's "cavalier attitude toward childcare," and "tender years" of children, supported finding of substance abuse and inability to provide regular care resulting in risk of harm].) Therefore, the b-2 count is also supported by substantial evidence.

II.    The dispositional orders must be reversed

Our conclusion that substantial evidence supports the juvenile court's jurisdictional findings does not end the inquiry. The governing statutes require a different focus, and a heightened burden of proof, at the dispositional stage of a dependency case.  (See, e.g., § 361, subd. (c)(1).)

Section 361, subdivision  (c)(1) provides that a "dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" of one of several enumerated grounds for removal, including "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents."  Subdivision (e) further provides that the juvenile court "shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal" and " 'shall state the facts on which the decision to remove the minor is based.' "  (See *In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.)

This additional inquiry and heightened burden of proof are " 'premised on the notion that' " even after parents have been found to have abused or neglected their children, " 'keeping children with their parents while proceedings are pending,

17

whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.' " (*In re D.P.*, *supra*, 44 Cal.App.5th at pp. 1066–1067; *In re I.R.* (2021) 61 Cal.App.5th 510, 520 [" '[b]ecause we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures' "].)

Although this court must still draw all reasonable inferences in support of the juvenile court's orders, we also keep in mind that dispositional orders must be based on the higher standard of clear and convincing evidence. (*In re Nathan E.*, *supra,* 61 Cal.App.5th at pp. 122–123; *In re I.R.*, *supra*, 61 Cal.App.5th at p. 520.) It is not necessarily true, as the Department asserts, that "the same evidence that supports the jurisdictional findings also supports the removal order." Instead, when we are "reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996, 1011.)

The Department was required to discuss, in its reports to the court, reasonable efforts to prevent or eliminate the need for removal. (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).) This requirement, and the corresponding section 361, subdivision (e) requirement that the juvenile court explicitly state the facts supporting removal, play important roles in the statutory scheme. (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1067; *In re Ashly* (2014) 225 Cal.App.4th 803, 810.) Without these requirements,

18

" 'reasonable efforts' " can become a hollow formula.  (*Ashly F.*, at p. 810.)

The Department's jurisdiction/disposition report, submitted in April 2020, contains no substantive consideration of any reasonable means by which the children could be protected without removing them from mother.  Under the heading "Child(ren)'s Safety In Home," the report contains only a conclusory recitation that "the risk level for future abuse and neglect is very high based off current substance abuse, domestic violence, prior child welfare history, prior criminal history, the young ages of the children and [mother]'s unmet mental health needs."  Under the heading "Reasonable Efforts," the report contains only a list of routine actions the Department social workers had taken, including "regular in person and telephonic contact" with the children, mother, and the fathers; "case management services (including service referrals and linkages)"; "crisis intervention, as needed"; interviews; notices of hearings; contact with services providers; referrals for drug testing; and referral of mother to drug court.  The Department's various supplemental reports and last minute information forms contain no further discussion of reasonable means to avoid the need for removal from mother.

The juvenile court did not, as required by section 361, subdivision (e), explicitly state the facts supporting its removal order.  The court's brief comment on the ages of the children and their need for sober parents, and reliance on the generic language of "Dependency Court Order 415," are not an adequate substitute for a case-specific discussion of the facts as of the time of disposition, the current risks to the children, and the means available, if any, to address these risks without removing the

19

children from mother.  (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1067.)

The section 361, subdivision (e) requirement is not a mere technicality.  The process of articulating what evidence meets the clear and convincing standard, and why there are no reasonable means to protect the children without removing them from a parent, can materially affect the juvenile court's decisionmaking process.  (See *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078 [requirement to make express finding on contested issue or statement of reasons for judicial decision "can directly influence the trial court's *actual reasoning process* by compelling it to consciously consider and resolve specified issues"].)

Given the specific facts of this case, we cannot find that this omission was harmless error.  There is at least a reasonable probability that the court would have reached a different result if the Department had complied with California Rules of Court, rule 5.690(a)(1)(B)(i), and if the juvenile court had consciously considered and explicitly stated whether the need for removal was proven by clear and convincing evidence.

At the time of the dispositional hearing, almost 10 months had passed since the detention hearing (due to court closures and delays caused by the COVID pandemic).  Mother had appeared at each court hearing after her arraignment in July 2020.  Mother had started therapy, submitted to a drug test which was negative for all substances, had a new residence which the Department had visited and assessed for safety hazards, and was consistently attending "video chat" visits with her children.  There was no evidence of any further domestic violence incidents—or even any ongoing contact—between mother and D.M.  (See *In re D.P.*, *supra*, 44 Cal.App.5th at p. 1068 [finding "reasonable chance"

20

that juvenile court would have reached different conclusion if it had complied with § 361, subd. (e), in light of changed circumstances between the time the dependency petition was filed and the time of the dispositional hearing]; *In re Ashly F.*, *supra*, 225 Cal.App.4th at p. 811 [same]; *In re Ma.V.*, *supra,* 64 Cal.App.5th at p. 25 [dispositional orders removing children from parent must be based on proof of current risk and lack of reasonable means to prevent removal; noting that over 10 months had passed between detention and dispositional hearing, no further domestic violence incidents had occurred, and "mother managed to improve her situation during a year that was stressful and difficult under the best of circumstances"]; *In re I.R.*, *supra*, 61 Cal.App.5th at pp. 521–522 [reversing dispositional order removing child where there was no evidence of continuing domestic violence or contact between mother and father since the time of detention].)

To address the juvenile court's concern that these young children needed sober parents, the court could order mother to participate in a drug program and submit to testing. To address the domestic violence issue, the court could order mother to participate in a domestic violence counseling program, and to enforce the criminal protective order and ensure that the children had no contact with D.M. other than during his court-ordered visitation. To address concerns about mother's mental health, the court could order her to continue participating in therapy, and to consistently take any prescribed medications. (See *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171–172 [reversing order removing child where trial court "failed to consider less drastic measures than removal" such as return to parents "under strict supervision"].) The record is devoid of any indication that any of

21

these alternatives to removal were considered, either by the Department or the court.

It may be that the evidence before the juvenile court on remand—including evidence of events occurring after December 2020—will be sufficient to show that these children cannot be protected from harm by any reasonable means other than continued removal from mother's custody.[7] But parents in dependency cases are entitled to the safeguards provided by section 361, subdivisions (c) and (e) against hasty or needless removal of their children, even if later events bolster the Department's case for removal. For this reason, we remand for a new dispositional hearing.[8]

III. The ICWA finding is conditionally affirmed

Remand is also necessary to ensure compliance with ICWA. The Department, after this appeal was filed, took some actions to address mother's claims that it had not complied with the inquiry and notice provisions of ICWA, including the obvious step of asking maternal aunts V. and R. for information about Indian heritage and for maternal grandfather's telephone number. Once the Department contacted maternal grandfather, he confirmed

---

[7] Mother's August 11, 2021 request for judicial notice, as to further findings and orders made by the juvenile court while this appeal was pending, is denied, as it was not necessary to consider to these later findings and orders.

[8] Mother also challenges the juvenile court's dispositional orders regarding her visits with the children, and placement of the two younger children. Given our conclusion that the dispositional order removing the children from mother's placement must be reversed and the matter remanded for a new dispositional hearing, we need not reach these issues.

22

that his mother claimed Indian heritage through affiliation with a tribe with "a foot at the end of it"—likely referring to the Blackfoot tribe. Having obtained this information, the Department should send updated notices to the Blackfoot tribe as well as the Bureau of Indian Affairs including additional information such as mother's date and place of birth (which were omitted in the original notices), maternal grandfather's current and former addresses and place of birth, and maternal great-grandmother's date and place of birth, date of death, and any other information that maternal grandfather may be able to provide. (§§ 224.2, subd. (e) & 224.3.)

## DISPOSITION

The jurisdictional findings are affirmed. The dispositional orders are reversed, and the matter is remanded to the juvenile court with directions to (1) hold another disposition hearing, and (2) order the Department of Children and Family Services to comply with ICWA and with Welfare and Institutions Code sections 224.2 and 224.3 for inquiry and subsequent notice if Indian heritage is indicated.

NOT TO BE PUBLISHED.

MATTHEWS, J.*

We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.